## FLYNN et al. v. CHRISTENSON et al.

(Circuit Court of Appeals, Ninth Circuit. May 2, 1921.)

No. 3542.

1. **Courts** ⬅═➡375—**State limitation statute held not applicable to libel in admiralty.**

Code Civ. Proc. Cal., § 340, limiting actions for libel, slander, or for injury to or for the death of one caused by the wrongful act or neglect of another, does not apply to a libel filed in an admiralty court for the recovery of civil damages for the death of a stevedore, since the applica-

tion of the state statutes of limitation would destroy the uniformity of admiralty law, and since section 337, giving the right of action for death by wrongful act or neglect of another, prescribed no time limit for the commencement of such action.

2. **Shipping** ☞86(2)—**Evidence held to sustain finding of ship's negligence.**

On libel for the death of a stevedore, evidence that rope furnished by schooner for a sling to be used in unloading lumber was too short for a double turn around the lumber, so that a single turn was used, which proved to be insufficient, *held* to sustain the court's finding that the schooner was negligent.

3. **Shipping** ☞86(2)—**Evidence held not to show contributory negligence of stevedore.**

Evidence that a stevedore was killed while he was preparing another load of lumber for the sling, when the previous load, after being swung over the side of the vessel, struck a string piece, as a result of which some of the lumber was knocked from the sling, and one piece swung aboard and struck the stevedore, *held* not to show contributory negligence by the stevedore, since it is unreasonable to require the men engaged in unloading the vessel to suspend their work, until each load has been safely landed, in order to protect themselves against the charge of contributory negligence.

4. **Death** ☞99(4)—**Award of $13,000 for father's death sustained.**

On a libel for damages resulting from the death of the husband and father of libelants, who was killed while working as a stevedore on a vessel, an award of $13,000, after an original award of $20,000 was reduced by the trial court, will not be disturbed.

5. **Shipping** ☞207—**Liability for death of stevedore, caused by negligence, can be limited.**

The liability of owners of a schooner for the death of a stevedore, resulting from the negligence of the vessel, can be limited to the respective interests of the owners in the schooner.

Appeal from the District Court of the United States for the First Division of the Northern District of California; Frank S. Dietrich, Judge.

Libel by David James Flynn and others, by their guardian and next friend, Honora Della Flynn, against E. A. Christenson and others, as joint owners of the schooner Sophie Christenson, to recover damages caused by the death of David James Flynn while employed as a stevedore in unloading the schooner. From a decree dividing the damages, libelants appeal. Decree modified, to allow full damages, and, as modified, affirmed.

The appellants are the widow and children of one David James Flynn, and were libelants in the court below against the appellees, as joint owners of the schooner Sophie Christenson, to recover damages growing out of his death. He was killed while employed as stevedore and engaged in helping to unload lumber from the schooner at San Pedro, Los Angeles county, Cal., in the year 1903. The cause was not brought to trial in the court below until about a year ago. Why it is unnecessary now to inquire.

The amended libel alleged that the defendants thereto are and at all times therein mentioned were joint owners of the schooner in certain specified proportions, and further alleged, among other things, that while the vessel was lying in the harbor of San Pedro and moored to the wharf there, the deceased was, with others, employed to remove the cargo of lumber from the vessel to the wharf, and while working in such employment in a proper way one of the sling loads of lumber was hoisted from the hold of the vessel under the direction of the defendants and its officers in a grossly negligent manner, and

while being so hoisted was so insufficiently secured by the sling rope that it resulted in some of the pieces of lumber slipping from the sling, one of which pieces struck the head of the said Flynn while he was working on the deck of the vessel, resulting in his death August 3, 1903; that the accident occurred without any negligence or want of care on the part of the deceased, but by reason of the negligence of the defendants, both in the handling of the sling load and also by reason of the fact that the rope was weak and inadequate, and of improper material for the purpose for which it was being used, and was insufficient in size, as well as too short to admit of the same being properly adjusted and fastened, so as to secure the sling load of lumber; that the widow and the minor children, of whom she alleged she was the duly appointed guardian, thereby suffered damages in the sum of $20,000, for which they prayed judgment.

The defendants, in answer to the amended libel, while making various denials, admitted the hoisting from the hold of the vessel of the lumber with which she was loaded "in lots, parcels, or sling loads made up of heavy planks and timbers bound together with rope slings," but denied that any of the sling loads were so hoisted or handled in a negligent manner, or were insufficiently secured, or that the sling was too short to admit of the same being properly adjusted or fastened to secure the lumber, or was insufficient in size or otherwise, and, while admitting that "some pieces of lumber fell and struck a man working on board said ship," denied "that the same was without any want of care or without negligence on the part of the man so hurt; on the contrary, these respondents on their information and belief allege that the said accident to the said man was due solely and entirely to his own negligence."

Andros & Hengstler and Louis T. Hengstler, all of San Francisco, Cal., for appellants.

Nathan H. Frank and Irving H. Frank, both of San Francisco, Cal., for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] As appears from the amended libel, the death of Flynn occurred August 3, 1903, and the record shows that the libel was not filed until August 12, 1904, a little more than one year thereafter. Wherefore it is contended on the part of the appellees that it was barred by the third subdivision of section 340 of the Code of Civil Procedure of California, which reads:

"3. An action for libel, slander, assault, battery, false imprisonment, seduction or for injury to or for the death of one caused by the wrongful act or neglect of another or by a depositor against a bank for the payment of a forged or raised check."

We think it obvious that the foregoing provision has no application to a libel filed in an admiralty court, containing the plaintiff's allegations as a basis for the recovery of civil damages, in so far as the word "libel" therein mentioned is concerned, but to libels based upon defamatory remarks or acts intended or which tend to bring one into disrepute. It is a part of the provisions commencing with section 335 of the Code of Civil Procedure of California prescribing the "Time of Commencing Actions Other Than for Recovery of Real Property," and has, in our opinion, no more application to a libel in admiralty than has the provision of the California statute of frauds to an agree-

ment between the parties to a libel in an admiralty court. See Union Fish Co. v. Erickson, 248 U. S. 308, 39 Sup. Ct. 112, 63 L. Ed. 261, Western Fuel Co. v. Garcia, 255 Fed. 817, 167 C. C. A. 145. Otherwise one admiralty court might be required to grant relief upon one such cause of action, and another such court deny it in a precisely similar cause, depending upon different and conflicting provisions of the state statutes upon the subject of limitations, thereby destroying the uniformity of rules governing admiralty courts. The provision of the California statute—section 377, C. C. P.—giving a right of action to the heirs or personal representatives of a person, not a minor, whose death is caused by the wrongful act or neglect of another, prescribing no time limit for the commencement of such action, a court of admiralty will enforce it in accordance with the recognized principles of maritime law. Authorities supra.

[2] The court below found that the alleged negligence was proved, and we are satisfied from an attentive examination of the evidence that it was properly so held. It shows that the rope provided by the schooner and used as a sling was not long enough for a double turn around the lumber. The single turn used, and which proved in the instant case insufficient, was, as the court found, extrahazardous, although sometimes used, and that to secure such bundles of lumber in the unloading of vessels the sling loads should be secured by a double turn of the rope around them, which was the usual and safer way.

The contention made on the part of the appellees that there was also wire rope on the schooner, which could have been selected by the deceased, is not supported by the record, which shows only, according to some of the testimony, that in loading the vessel at the mill wire rope was used. Whether such rope was furnished by the mill or was part of the equipment of the schooner was not shown.

[3] The court below, however, found that the deceased was guilty of contributory negligence, and accordingly divided the damages found by it to have been caused by the death of the deceased, allowing the libelants one-half thereof. We are of the opinion that the conclusion reached by the trial court regarding the alleged contributory negligence of the deceased is not justified by the record. It appears that two of the schooner's men, Ehlert and Kenyon by name, made up the load in question on the starboard side of the vessel, and when it was ready for hoisting the mate was notified, and it was started by means of a donkey engine on its way to the wharf—the vessel having a slight list to the wharf to facilitate unloading. The mate was not called as a witness, but the master of the schooner was by the respondents, and he gave this account of the accident—the pertinent portions only being here given:

"I came along from aft and was going forward. * * * When I came forward, they were leaving a load up out of the hold, and the load started to slip; there were a couple of planks slipped out of the load. It was a single load, 12 by 12's, and I suppose 20 pieces in it. I seen the pieces start in to slip out, and I said to everybody, 'Get out of the way! get out of the way!' And everybody was out of the way, all walked away, and the load swung in to the wharf. When it came in to the wharf the donkeyman didn't let it go;

he could have let it go, but he kind of held on, and the load swung back, and one plank slipped out again, and it stood on end. Mr. Flynn, the man that got hurt, had gone back; he was warned to get away, and he was away; he was between the poop and the mizzenmast, but he went back again; nobody told him to go back; he went back on his own account, and this plank fell out and hit him on top of the head."

Being asked the question, "You stated, did you not, that it came back from the wharf?" The witness answered:

"Yes; it swung off the wharf, and a piece fell out; it stood on end this way, and the other end hit Mr. Flynn right in the head."

The donkey engine man—Nilsson—testified that at the time of the accident Flynn was working with another man on the deck abreast of the mizzenmast making up a sling load of the lumber, there being two other men similarly engaged on the other side of the deck. As the latter were on the starboard side Flynn was on the port side of the boat. In describing how the accident happened, Nilsson said, among other things:

"I was heaving up a load of lumber, and when I got the load up/ high enough, the gaff was hanging out a little, so she came over the wharf like; * * * hanging over the rail like. * * * And then a few pieces—I don't know how many—six or seven of those short planks fell out, and they fell right between, into the water. Well, the mate was singing out for those people on deck to stand clear. Q. Did you holler out, too? A. Not that time; I don't think I did. I might have, but I am not quite sure. Just after a little while those planks that were left, they fell off the sling and fell in the same direction that man was at work. If the three of them, the planks, fell, that is more than I remember, because I got kind of excited when I saw the man get hurt. So I don't remember whether those two planks fell down or not, or whether one plank struck him; I can't say anything about that. Q. How did they strike him? A. The man was standing with his back to the load, and the plank just hit him in the back of the head, with the end of the plank. Q. Do you know whether or not the man had stood clear when the mate called out, and went back again to his work? A. I don't know that. Q. You do not know? A. I don't know that. Q. Were you inside of the donkey house? A. If that man was away and came back again, that is more than I can tell, because I had my eyes on that load then. So I can't say anything about that, whether he was away or not."

Ehlert, one of the men who made up the load that collapsed, being asked whether he heard any one call out to stand clear when that load went up, answered:

"Yes, sir; not when the load went up, but when the load fell. That is the time they sang out to stand clear, but it was too late then. Q. It was too late then? A. Yes, sir. Q. You are sure no one said to stand clear until the load fell? A. That is right."

Having testified that he witnessed the accident, and being asked to describe it as well as he could, the witness answered:

"Well, the load went up—I hooked it on this—the load went up, and the mate always gives the order. The mate said, 'Go ahead.' He gives one whistle, which means 'Go ahead.' When he thinks it is high enough, he gives another whistle to stop. Then he sings out 'Come back.' When the load swings towards the wharf, he sings out 'Come back.' Q. Go on and tell us how it happened with this particular load. A. The mate sang out 'Go ahead.' He sang out 'Hi.' He sang out 'Come back.' When the load came back, it hit the stringer on the wharf, because the ship was lower than the stringer, about 2

feet lower than the stringer, and it shook it, and half of it fell out between the ship's side. There were three planks left, and the gaff swung inside because there was nothing to hold it on the wharf. The gaff swung in, and the planks, what was left, fell between the ship's side and the wharf; three planks were left, and they swung in and killed him."

The other seaman who helped make up the sling load in question, and who gives the name of his companion worker as "Elliott," after describing the manner of making up that sling load and the order of the mate to go ahead, being asked to describe the rest of the operation, answered:

"We were all told to get out of the way, of course, when the lumber was going to swing right across the ship. Q. Go right ahead and tell us what happened after that. A. The lumber was still going up, and shaking back and forth, as they do; no guide at all attached to it; going up, it was high enough, and came back, and the mate sang out to come back. Q. What was done then? A. It struck the stringer of the wharf. Q. What does 'come back' mean in that case? A. 'Come back' is to lower away. Q. After the load struck the stringer of the wharf, what happened then? A. It shook the load, and some pieces fell down between the ship and the wharf, and the remaining three pieces swung aboard, and one piece struck this man Flynn. Q. Where did it strike him? A. Right on the head, sir. Q. Did you see the plank strike him? A. Yes, sir. Q. What was Mr. Flynn's position at the time, and what was he doing when the plank struck him? A. He was just lifting a big piece of timber, so as for another man to put the block under the piece of timber, so as to allow the sling to go underneath. Q. He was making up a new sling load, was he? A. Yes, sir. Q. Whereabouts on the deck was he at that time? A. Well, he was more near to the mizzenmast. Q. Near to the mizzenmast, and between what masts? A. The main and the mizzen. Q. If I understand you, the gaff was swung between the main and mizzen masts, was it? A. Yes, sir. ·Q. The loose end toward the mizzen? A. Towards aft—the mizzen."

The latter witness also testified in substance that there was no machinery on the schooner for the purpose of making the lumber swing off towards the wharf, but a slight list of the vessel that way, the effect of which was to further the delivery of the lumber, and that the wharf was higher than the deck of the vessel, the port side of which was next the wharf. That witness was also questioned, and answered, as follows:

"Q. Now, as I understand you, this had passed clear over the vessel, and over to the wharf, and then struck the wharf, and most of the load fell in between the wharf and the vessel into the water? A. Most of the load fell between the wharf and the vessel's side. Q. When this was swung over, what were you doing? A. I was looking at it. We generally look to see that it goes clear of the ship. We don't like to see pieces falling out there every time. Q. Did you keep your eye on that sling load? A. We generally keep an eye on it all the time, on every sling we send up. Q. What I want to know is, did you watch that sling load till it struck the wharf and dropped—did you keep your eye on it all the time? A. I kept my eye on it all the time."

We think it clear that, after the load had swung from the vessel to the wharf, it could not be reasonably expected by Flynn that it would or might swing back to the vessel, but, on the contrary, that it was his duty, after it left the vessel, to proceed with his work, as the evidence shows without conflict he did. The opposite view would not only justify, but require, the men engaged in unloading the vessel to suspend

their work until each load, not only left the boat, but was safely landed, in order to protect themselves against the charge of contributory negligence—a very costly and, in our opinion, a highly unreasonable rule to adopt.

[4, 5] The court below first fixed the amount of damages occasioned the plaintiffs by the death of the deceased at $20,000, but upon subsequent consideration reduced the amount to $13,000, dividing the damages between plaintiffs and respondents. With the modified amount of damages so fixed we see no valid ground to interfere, nor do we think the court committed any error in holding the respondents' liability limited to their respective interests in the schooner. Its ruling in that regard is, we think, well supported by the decision of the Supreme Court in Richardson v. Harmon, 222 U. S. 96, 32 Sup. Ct. 27, 56 L. Ed. 110. The libel as amended proceeded upon such limited liability, and we see nothing in the evidence to justify a departure therefrom.

Accordingly, the decree must be so modified as to run against each appellee for his proportionate share of $13,000, and for his proportionate share of the costs in both courts, and, as so modified, it will stand affirmed.